310 Ga. 586
FINAL COPY

S20A1195. KNIGHTON v. THE STATE.

NAHMIAS, Presiding Justice.

Appellant Quran Knighton was convicted of malice murder and possession of a knife during the commission of a felony in connection with the stabbing death of Markice Harris. Appellant contends that by twice interrupting his counsel's closing argument to provide instructions to the jury, the trial court committed plain error and denied him his constitutional right to a fair trial, and that his trial counsel provided ineffective assistance by failing to object to the interruptions and instructions. We affirm.[1]

---

[1] Harris was killed on May 19, 2016. In July 2016, a Newton County grand jury indicted Appellant for malice murder, felony murder, aggravated assault, and possession of a knife during the commission of a felony. At a trial from October 17 to 19, 2017, the jury found Appellant guilty of all charges. The trial court sentenced him to serve life in prison for malice murder and five consecutive years for the knife offense; the remaining counts were vacated or merged. Appellant filed a timely motion for new trial, which he amended with new counsel in June and July 2019. After an evidentiary hearing, the trial court denied the motion in December 2019. Appellant filed a timely notice of appeal, and the case was docketed to this Court's August 2020 term and orally argued on September 15, 2020.

1. Viewed in the light most favorable to the verdicts, the evidence presented at Appellant's trial showed the following. In May 2016, Appellant, who was then 16 years old, was friends with Harris, who was 18. On May 19, however, they argued during a group text conversation after Appellant accused Harris of lying about where Harris lived. Following a protracted dispute through the group text messages, Harris sent a text saying that he and Appellant should have a fist fight.

Around 5:30 p.m., Harris sent Appellant a text saying that he was outside Appellant's house and wanted to fight. Two hours later, Appellant responded that he had been asleep, and Harris sent a text saying that they could meet tomorrow. Harris then sent Appellant texts saying, "no funny sh\*\*"; "leave that dam[n] pocket knife in the house"; "You try sum funny I'll try sum funny"; and "I'm really [fixing to] just kill yo Sh\*\* . . . better hop[e] I can control myself." Appellant and Harris eventually agreed to meet later that night. Appellant then sent texts to a female username (which unbeknown to Appellant was actually used by Harris) saying that Harris was a

liar. When Harris (through the female username) sent a text saying, "don't fight [Harris]," Appellant responded "Imma shoot him And his momma" and "We [fixing to] get ready to go to his house and light that Sh** up."

Briana Mosley, a 17- or 18-year-old relative who lived with Appellant, gave the following account in her trial testimony. Later that evening, she walked with Appellant to Harris's gated subdivision, where they waited for Harris outside the gate. When Harris arrived, he walked toward Appellant and punched him. Appellant then took off his jacket and started fighting with Harris. They fell to the ground, where Harris began punching Appellant and banging his head against the ground. Mosley tried to intervene, and one of Harris's neighbors who was driving out of the subdivision stopped his car and asked if Mosley needed help.[2] Appellant and Harris stopped fighting, stood up, and began to walk away from each other, and the neighbor drove away.

---

[2] The neighbor testified that he saw Harris fighting with a "girl" and a "smaller boy," who was bloody and "the more battered of the two [males]."

Appellant then told Mosley that he needed to get his jacket, and as he walked back toward Harris, Harris said something and they began to fight again. Mosley got out her cell phone to call for help; when she looked up, she saw that Harris had what she thought was a pocket knife. Appellant and Mosley tried to take the knife away from Harris. As Appellant wrested it away, Mosley's hand was sliced. Appellant then pushed Mosley out of the way and began slashing the knife at Harris. Harris said to Mosley, "You got stabbed, too," before he ran a few steps and fell to the ground. As Appellant fled, Mosley saw that Harris was not responsive. She called her grandfather on her cell phone and ran to her house after he told her to go there to call the police. Appellant arrived at the house about five minutes after Mosley; he then threatened to kill himself with a kitchen knife, which she took away from him.

Another family member called 911, and responding officers and medical personnel soon arrived at Appellant's house. Appellant came out with his hands up, and Mosley led the responders to Harris, who had died from stab wounds. Officers searched the scene

4

of the fight and Appellant's house for the knife used to kill Harris, but it was never recovered.

A responding officer observed that Appellant had scrapes and bruises but no significant injuries. When the officer asked Appellant if he was injured, he replied only that he "had some bruises and scrapes." Medical responders then checked him over and cleared him to be transported to the sheriff's office. A few hours later, an investigator took photos of Appellant's injuries, which included several scrapes and some bruises and swelling, but Appellant did not report any stab wounds and the investigator did not observe any stab wounds or any significant amount of blood on Appellant.

Investigators interviewed Mosley that night. She told them that she saw Harris with the knife first; that she did not know whether it belonged to Appellant or Harris; and that she said to Appellant after the stabbing, "I have to tell on you." The next morning, Mosley met with two probation officers in connection with an unrelated case. She told the officers that after Harris repeatedly banged Appellant's head on the ground during the fight, she and

Appellant went back to their house, where Appellant got a knife and then returned to the subdivision's entrance to confront Harris.[3]

The medical examiner who performed Harris's autopsy testified that he had several incised (cutting) wounds: one on the back of his head that penetrated his skull; one on his back; two on the left side of his chest; and one on his finger, which the examiner characterized as a defensive wound. Harris also had four stab wounds: one on the right side of his face; one on his chest that perforated his heart; and two on the right side of his body, one of which punctured his right lung. In addition, he had abrasions on his hands, right shoulder, back, and knees. The medical examiner concluded that the blade of the knife used to stab Harris was at least five-and-a-half inches long.

Appellant testified, claiming that he stabbed Harris in self-defense. He gave the following account of the day of the incident. He agreed to meet Harris but did not believe that they were actually

---

[3] Both probation officers testified about what Mosley told them. Mosley testified that she did not tell the officers that Appellant returned to their house to get the knife.

going to fight. When Harris arrived, he punched Appellant and they began fighting; after the neighbor spoke to them, they stopped fighting and Appellant turned to walk home; but when he went back to get his jacket, Harris hit him. Appellant then saw that Harris was holding a "pocket knife," which Appellant recognized because he had seen Harris buy it sometime earlier. Harris tried to stab Appellant, who was scared and believed that Harris was going to kill him. Appellant pulled the knife away from Harris, who was still trying to fight him, and the next thing he remembered was "going crazy" and Harris walking away. Appellant dropped the knife and ran straight home, where he threatened to kill himself with a kitchen knife.[4] Appellant claimed that on the day after he was arrested, he discovered that he had a stab wound on his side. He also claimed that he did not own a knife, and Mosley testified that she had never seen Appellant carrying a knife.

---

[4] When asked on cross-examination why Mosley had testified that Appellant arrived home five minutes after her, he claimed that she had not seen that he was already in the house because he was upstairs using the phone to call his stepfather. The prosecutor later argued that Appellant actually did arrive later, using the time to throw the murder weapon in a nearby lake.

Appellant does not challenge the legal sufficiency of the evidence supporting his convictions. Nevertheless, in accordance with this Court's waning practice in murder cases, we have reviewed the record and conclude that, when viewed in the light most favorable to the verdicts, the evidence presented at trial and summarized above was sufficient to authorize a rational jury to reject Appellant's claim that he killed Harris in self-defense and to instead find him guilty beyond a reasonable doubt of the crimes of which he was convicted. See *Jackson v. Virginia*, 443 U.S. 307, 319 (III) (99 SCt 2781, 61 LE2d 560) (1979). See also *Shaw v. State*, 292 Ga. 871, 872 (742 SE2d 707) (2013) ("'[I]ssues of witness credibility and justification are for the jury to decide, and the jury is free to reject a defendant's claim that he acted in self-defense.'" (citation omitted)).[5]

2. Shortly after beginning his closing argument, Appellant's

---

[5] We remind litigants that this Court will end its practice of considering the sufficiency of the evidence sua sponte in non-death penalty cases with cases docketed to the term of court that begins in December 2020. See *Davenport v. State*, 309 Ga. 385, 399 (4) (846 SE2d 83) (2020). The Court began assigning cases to the December term on August 3, 2020.

counsel said:

> This case, as I sort of mentioned in the beginning boils down to one thing: Do you believe from the evidence that [Appellant] brought this knife to the fight and attacked Mr. Harris with it, or do you believe that Mr. Harris brought the knife and in the fight [Appellant] took it away from him? You might think that well, maybe he did, but maybe is not enough. The State has to prove, the State has to prove that [Appellant] brought the knife to the fight and it was his knife.

The trial court interjected, "Counsel, that's simply not true," and asked the lawyers to approach the bench. The bench conference was not transcribed. When it concluded, the court addressed the jury:

> Let me say what I said to them up here. At the moment of the stabbing the issue is formed who did the stabbing; secondly, was [it] justified who did the stabbing under the laws of self defense. There will be other laws I give you about other things, so his statement that if you found that the victim brought the knife to the fight that ends your determination is what I was saying is not accurate. It's at the time of the stabbing those two things I told you; is that clear to everybody? Okay. You may proceed.

Appellant's counsel resumed his closing argument, clarifying that "[i]f you . . . find that [Appellant] had to take the knife away from him, Mr. Harris[,] to protect and save his life, you would have to acquit." Counsel proceeded to argue that Mosley was credible and

9

that the probation officers were not credible and then said:

> They have got to show, they got to somehow show that my client, it wasn't self defense, that he had a knife, you know, when I said a minute ago it turns on who brought the knife, well it turns on how, I will say it a little better, how [Appellant] got the knife. When the Government knows, the Government knows that this case, that that's the most critical point in the whole case and that's why they didn't —

The court interrupted:

> Counselor, I will again say, it doesn't matter how he got the knife, it's when the stabbing occurred, was the defendant justified in using self defense as the defense? You said it's how he got the knife. It's not how he got the knife; am I — is everybody clear on that? Okay. You can go ahead.

Appellant's counsel then continued his argument, primarily asserting that Appellant acted in self-defense because he reasonably believed that Harris was going to kill him.

In this Court, Appellant contends that the trial court's two instructions to the jury amounted to plain error; that the court's interrupting closing argument to provide those instructions denied him his constitutional right to a fair trial; and that his trial counsel provided ineffective assistance by failing to object to the

10

interruptions and instructions. We will address each of these claims in turn.

(a) Appellant argues first that the trial court essentially instructed the jury to ignore evidence that Harris brought the knife to the fight and attacked Appellant with it. He asserts that the court's first instruction told the jury to focus only on the moment of the stabbing and that the second instruction said that how Appellant got the knife was irrelevant. As Appellant acknowledges, his trial counsel did not object to the instructions, so we review this claim for plain error, meaning that we will reverse the trial court only if the alleged instructional error was not affirmatively waived; was clear and obvious, rather than subject to reasonable dispute; likely affected the outcome of the trial; and seriously affected the fairness, integrity, or public reputation of judicial proceedings. See *Stripling v. State*, 304 Ga. 131, 135 (816 SE2d 663) (2018). See also OCGA § 17-8-58 (b). An appellant must establish all four elements of the test in order to demonstrate plain error, see *Stripling*, 304 Ga. at 135, so satisfying this test "'is difficult, as it should be.'" *Hood v.*

11

*State*, 303 Ga. 420, 426 (811 SE2d 392) (2018) (citation omitted).

The trial court's first instruction was prompted by defense counsel's argument that "the State has to prove that [Appellant] brought the knife to the fight and it was his knife." As Appellant candidly concedes in his brief, that assertion was a misstatement of the law, because the State was not required to demonstrate that Appellant owned the knife used in the killing or brought that knife to the fight in order to disprove beyond a reasonable doubt his claim of self-defense. Although at a trial the State must disprove a defendant's claim of self-defense beyond a reasonable doubt, see *Gardhigh v. State*, 309 Ga. 153, 157 (844 SE2d 821) (2020), "'there is no requirement that [the State] prove its case with any particular sort of evidence.'" *Dobbins v. State*, 309 Ga. 163, 165 (844 SE2d 814) (2020) (citation omitted). In many cases, a defendant has been found guilty of murder and the conviction upheld on appeal even when there was some evidence that he disarmed the victim and then used the victim's weapon in self-defense. See, e.g., *Parks v. State*, 300 Ga. 303, 303-305, 308 (794 SE2d 623) (2016); *Ruffin v. State*, 296 Ga.

262, 262-264 (765 SE2d 913) (2014); *Jimmerson v. State*, 289 Ga. 364, 365-367 (711 SE2d 660) (2011).

And although the trial court could have dealt with counsel's misstatement in a number of ways, the court was authorized to interrupt his closing argument to prevent his continuing to misstate the law and to correct any confusion that he may have caused the jury. See *Davis v. State*, 234 Ga. 730, 731 (218 SE2d 20) (1975) ("It has long been within the realm of a judge's authority to correct misstatements made by counsel as to what the law is."). See also *Venturino v. State*, 306 Ga. 391, 400 (830 SE2d 110) (2019) (explaining that "attorneys are not permitted to misstate the law to the jury"); *Battle v. State*, 305 Ga. 268, 275-276 (824 SE2d 335) (2019) (concluding that after defense counsel objected to the prosecutor's misstatements of the law during his closing argument, the trial court took "appropriate corrective action" by admonishing the prosecutor and instructing the jury on the points that had been misstated); *Jones v. State*, 110 Ga. 252, 252 (34 SE 205) (1899) (holding that when defense counsel asserted in argument that if the

13

victim had used a certain vile epithet, the defendant would be justified in fatally stabbing him, the trial court did not err by interjecting to instruct the jury that there was no such law and that no opprobrious words or abusive language could justify a killing).[6]

The trial court then explained that the jury would have to make a determination of whether Appellant acted in self-defense "[a]t the moment of the stabbing," and that a finding that Harris brought the knife to the fight would not end that determination. Those were accurate statements of the law. Even if the jury found

---

[6] We note, however, that particularly when opposing counsel does not deem a misstatement of the law worthy of objection, the trial court may not be *required* to interrupt the closing argument to correct the misstatement. See *Venturino*, 306 Ga. at 399 (holding that misstatements of the law are "outside the purview of OCGA § 17-8-75," which requires the trial court to interpose and prevent counsel from making in front of the jury only " 'statements of prejudicial matters which are not in evidence'"). See also *Varner v. State*, 306 Ga. 726, 734-735 (832 SE2d 792) (2019) (explaining that counsel may have valid strategic reasons for not objecting to opposing counsel's argument misstating the law). Among other things, the court might see how the other party addresses the misstatement during argument or might wait for the final jury instructions to address the issue. See, e.g., *Varner*, 306 Ga. at 735 (holding that a misstatement of law during closing argument caused no prejudice where the court instructed the jurors that the court would charge them on the law and correctly instructed them on the law at issue during the final charge). Nevertheless, the possibility or even the preferability of dealing with an issue differently when viewed in hindsight does not render a court's decision in the moment at trial an abuse of the court's broad discretion to supervise the proceeding.

that Harris brought a knife to the fight, in order to determine that Appellant acted in self-defense, the jury would have to find — among other things — that he reasonably believed that it was necessary to defend himself against Harris's "*imminent* use of unlawful force." OCGA § 16-3-21 (a) (emphasis added). See also *Rammage v. State*, 307 Ga. 763, 766 (838 SE2d 249) (2020) ("[T]he doctrine of reasonable fear does not apply to any case of homicide where the danger apprehended is not urgent and pressing, or apparently so, *at the time of the killing*." (citation and punctuation omitted; emphasis added)); *Jimmerson*, 289 Ga. at 367 (explaining that "'[a] homicide is not justified if the force used by the defendant exceeds that which a reasonable person would believe was necessary to defend against the victim's unlawful act,'" so if a defendant uses excessive force to kill a victim after disarming him, the defendant may be found guilty of murder (citation omitted)).

Thus, the trial court correctly instructed the jury to determine whether Appellant acted in self-defense at the time of the stabbing. And although Appellant argues otherwise, nothing in this

15

instruction told the jury to disregard evidence pertaining to the time before and after the stabbing. The court instead properly directed the jury not to confine its determination of self-defense to the issue of whether Harris brought the knife to the fight. Accordingly, we see no obvious error in the first instruction. See *Stripling*, 304 Ga. at 135.

A closer question is presented by the trial court's second instruction, which was given in response to defense counsel's contentions that the State was required to show that Appellant "had a knife," that the case "turn[ed] on" how Appellant got the knife, and that the State knew that how Appellant got the knife was "the most critical point in the whole case." Although the latter two statements were not improper when considered in isolation, the first statement essentially repeated the argument that the court had already correctly deemed inappropriate. See *Styles v. State*, 309 Ga. 463, 470 (847 SE2d 325) (2020) ("A closing argument is to be judged in the context in which it is made." (citation and punctuation omitted)). The court was therefore authorized (but, again, not required) to

interrupt counsel to provide a second instruction to the jury. See *Davis*, 234 Ga. at 731.

Unlike the first instruction, which the trial court gave after time for reflection during a bench conference with counsel, this time the court immediately said, "[I]t doesn't matter how [Appellant] got the knife, it's when the stabbing occurred, was [he] justified in using self defense," and "It's not how he got the knife . . . is everybody clear on that?" The court's statement about the knife not "matter[ing]" incorrectly suggested that all of the evidence about how Appellant got the knife was irrelevant, and the court's asking if the jury was "clear on that" emphasized that point. Those parts of the instruction were inartful, but viewed in light of the instruction that preceded them and the jury instructions as a whole, we conclude that they did not rise to the level of obvious or harmful error. See *Foster v. State*, 306 Ga. 587, 590 (832 SE2d 346) (2019) (explaining that an allegedly erroneous jury instruction must be evaluated "in the context of the instructions as a whole").

To begin, it appears that the court's second instruction —

17

which started with, "Counselor, I will again say" — was an attempt to restate the first instruction. Both instructions correctly informed the jury that it had to make the determination of whether Appellant acted in self-defense at the time of the stabbing. The first instruction, however, said that a finding that Harris brought the knife to the fight would not "end[ the jury's] determination" of self-defense, while the second instruction went a step further, saying that whether Harris or Appellant brought the knife to the fight did not "matter." That difference in language is problematic, but Appellant did not bring this concern to the court's attention during the trial, and given the other similarities in the two instructions, the court (as well as the parties and the jury) might well have viewed the second instruction as a reiteration of the first one it had given. See *Cheddersingh v. State*, 290 Ga. 680, 684-685 (2) (724 SE2d 366) (2012) (explaining that under the plain error test, the error must be so obvious that "'the trial judge and prosecutor were derelict in countenancing it, even absent the defendant's timely assistance in detecting it'" (quoting *United States v. Frady*, 456 U.S. 152, 163 (102

18

SCt 1584, 71 LE2d 816) (1982))).

Moreover, during its final charge of the jury after the closing arguments, the trial court fully and accurately instructed on justification, self-defense, no duty to retreat, and excessive force. The court also repeatedly directed the jury to consider all of the circumstances of the case, saying that the facts are for the jury to determine "from all of the evidence presented" and "given all of the circumstances of the case"; that the jurors must acquit Appellant if their minds are unsettled after giving consideration "to all the facts and circumstances of this case"; that the jury must determine whether or not the killing was done "in circumstance[s] that would be justifiable"; and that the standard for self-defense "is whether the circumstances were such they would excite . . . the fears of a reasonable person." These instructions were repeated nearly verbatim when the trial court recharged on justification after the jury requested clarification about the charge. The jury was therefore fully informed that it was to consider all of the circumstances and evidence in the case.

19

In sum, the trial court's statement about the knife not "matter[ing]," when evaluated in the context of the first instruction and the charge as a whole, did not create a clear and obvious error beyond reasonable dispute with respect to the jury's understanding that it was to consider all of the evidence presented at trial in determining whether Appellant acted in self-defense when he fatally stabbed Harris. See, e.g., *Jackson v. State*, 306 Ga. 706, 712-713 (832 SE2d 809) (2019) (holding that after considering the charge as a whole, the trial court's "unfortunate slip-of-the-tongue" resulting in one improper instruction on malice murder would not have misled or confused the jury and did not amount to plain error); *Jackson v. State*, 303 Ga. 487, 490 (813 SE2d 372) (2018) (concluding that the trial court's failure to give a separate instruction on proximate causation was not an obvious error because the jury charge as a whole adequately instructed on the element of causation for the crimes of which the defendant was convicted); *Hood*, 303 Ga. at 426 (holding that the alleged errors in jury instructions on justification were not obvious when viewed in light of the instructions as a

20

whole).[7]

For the same reasons, Appellant has not shown that, but for the trial court's isolated improper statement, there is a reasonable probability that the outcome of the trial would have been more favorable to him. See, e.g., *Jackson*, 306 Ga. at 713 (holding under plain error review that because the charge as a whole would not have misled or confused the jury, the trial court's one incorrect instruction was not harmful); *Hood*, 303 Ga. at 426 (holding that the appellant could not show that the trial court's failure to provide additional jury instructions regarding his justification defense likely affected the outcome of his trial, because the instructions as a whole provided the jury with sufficient direction to evaluate that defense). Accordingly, Appellant has not met his high burden of establishing

---

[7] In support of his argument that the trial court committed plain error by giving the two instructions, Appellant cites several cases in which there was some evidence that a defendant killed a victim in self-defense after they struggled over a weapon. See, e.g., *Jackson v. State*, 282 Ga. 494, 496 (651 SE2d 702) (2007); *Koritta v. State*, 263 Ga. 703, 704 (438 SE2d 68) (1994). Those cases hold nothing, however, about jury instructions on self-defense of the sort at issue in this case, and to the extent Appellant argues that they demonstrate the jury's duty to examine all of the circumstances in determining whether a defendant acted in self-defense, we have just explained that the trial court repeatedly instructed on that duty during its final charge.

plain error.

(b) Appellant next contends that the trial court deprived him of a fair trial because the two interruptions and instructions prevented his counsel from making a full closing argument. We may assume without deciding that this claim is preserved for appellate review, because Appellant has not shown that his right to a fair trial was violated.

The trial court's interruptions and instructions did not preclude Appellant's counsel from robustly arguing that Harris brought the knife to the fight and used it to attack Appellant. Indeed, counsel focused his closing argument on the evidence that Harris brought the knife to the fight and attempted to discredit the evidence that Appellant went back to his house to get the knife. Counsel argued that Mosley, "the only eye witness," told investigators and testified at trial that Harris "brought the knife to the fight and had the knife first," which was a "huge problem" for the State's case. Counsel also asserted that the prosecutor did not inform the jury that Mosley told the same story to investigators that

she told at trial. In addition, counsel argued that the probation officers who testified that Mosley said that Appellant went back to their house to get the knife were not credible, because the officers did not have Mosley write and sign a statement and because it would have taken Appellant about 20 minutes to go home to get the knife while Harris waited for them to resume their fight, which was implausible. Counsel discussed the law of self-defense and repeatedly argued that the State could not prove that Appellant had the knife first; that Harris "brought [the] knife to the fight" and "tried to kill" Appellant, who was afraid and fought "to save his life"; and that Appellant had "the right to not retreat" and to respond with lethal force "to stop [Harris]."

Appellant has not established that the trial court prevented his counsel from fully arguing his theory of self-defense. Thus, Appellant has not shown that the court violated his right to a fair trial. See, e.g., *Terrell v. State*, 271 Ga. 783, 786-787 (523 SE2d 294) (1999) (holding that the trial court did not abuse its discretion by preventing defense counsel from arguing "that the State had

something to hide," because the "court has discretion to determine the range of proper closing argument" and counsel was permitted to and did argue that the State did not adequately investigate the case and that its witnesses were not credible), disapproved on other grounds by *Willis v. State*, 304 Ga. 686 (820 SE2d 640) (2018); *Massey v. State*, 272 Ga. 50, 51 (525 SE2d 694) (2000) (holding that the trial court did not abuse its discretion in restricting the defendant's closing argument by admonishing defense counsel not to misstate the law).[8]

(c) Finally, Appellant claims that his trial counsel provided

---

[8] Relying on cases holding that prejudice to a defendant is presumed when the trial court errs by violating the statutory requirement that counsel be given two hours for closing argument in a murder case, see, e.g., *Ricketts v. State*, 276 Ga. 466, 470-471 (579 SE2d 205) (2003), Appellant asserts that we should presume prejudice in this case. But those cases do not apply here, because Appellant does not argue and the record does not indicate that the trial court improperly limited the amount of time for closing argument. Also, to the extent Appellant asserts that certain remarks during the prosecutor's closing argument exacerbated the alleged errors in the trial court's interruptions and instructions, his counsel did not object to those remarks, so the issue is not preserved for review on appeal, even under a plain error standard, see *Norman v. State*, 298 Ga. 344, 347 (781 SE2d 784) (2016), and Appellant does not enumerate as error that his trial counsel provided ineffective assistance in this respect.

ineffective assistance by failing to object to the trial court's interruptions and instructions. To prevail on this claim, Appellant must prove both that his counsel's performance was professionally deficient and that he was prejudiced as a result. See *Strickland v. Washington*, 466 U.S. 668, 687 (104 SCt 2052, 80 LE2d 674) (1984). To establish deficient performance, Appellant must show that counsel performed his duties in an objectively unreasonable way, considering all the circumstances and in the light of prevailing professional norms. See id. at 687-690. To prove prejudice, Appellant must demonstrate a reasonable probability that, but for counsel's deficient performance, the result of the trial would have been different. See id. at 694. We need not address both parts of the *Strickland* test if Appellant makes an insufficient showing on one. See id. at 697.

Appellant claims first that his trial counsel provided ineffective assistance by failing to object to the interruptions and instructions on the ground that the trial court prevented him from making a full closing argument. Because we concluded in Division 2 (b) above that

25

the court did not err in that respect, counsel did not perform deficiently by failing to make such an objection. See *Smith v. State*, 308 Ga. 81, 89 (839 SE2d 630) (2020) ("'[D]eficient performance is not shown by counsel's failure to raise a meritless objection.'" (citation omitted)).

Appellant argues next that his trial counsel was ineffective for failing to object to the trial court's instructions on the ground that they told the jury to ignore evidence that Harris brought the knife to the fight. As discussed in Division 2 (a) above, the trial court initially interrupted counsel's closing argument to correct his misstatement of the law and to provide an accurate instruction on the law of self-defense. An objection to that instruction would have been meritless, so trial counsel did not perform deficiently by deciding not to object. See id.

As we also discussed above, the trial court in its second instruction improperly said that it did not matter how Appellant got the knife, although we have already explained why that part of the instruction did not amount to an obvious or harmful error under

26

plain error review. Even if we assume that trial counsel performed deficiently by failing to object to that aspect of the instruction, Appellant has not established that any such deficiency resulted in prejudice, as "the test for prejudice in the ineffective assistance analysis is equivalent to the test for harm in plain error review." *Roberts v. State*, 305 Ga. 257, 265 (824 SE2d 326) (2019) (citation and punctuation omitted).

For these reasons, Appellant's ineffective assistance claims lack merit.

*Judgment affirmed. Melton, C. J., and Boggs, Peterson, Bethel, Ellington, and McMillian, JJ., concur. Warren, J., not participating.*

DECIDED DECEMBER 21, 2020.
Murder. Newton Superior Court. Before Judge Ott.
*Brian Steel*, for appellant.
*Layla H. Zon, District Attorney, Bailey R. Simkoff, Candice L. Branche, Assistant District Attorneys; Christopher M. Carr, Attorney General, Patricia B. Attaway Burton, Deputy Attorney General, Paula K. Smith, Senior Assistant Attorney General, Matthew B. Crowder, Assistant Attorney General*, for appellee.